WILLIAM FELL JOHNSON, ET AL. *v.* CONSOLIDATED GAS, ELECTRIC LIGHT & POWER CO. OF BALTIMORE

[No. 42, October Term, 1946.]

456

*Decided January 8, 1947.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*Herbert M. Brune, Jr.*, with whom were *Edward H. Burke, Arthur W. Machen, William Fell Johnson* and *H. Courtenay Jenifer* on the brief, for the appellants.

*Alfred P. Ramsey* and *Paul S. Clarkson*, with whom was *Edwin M. Sturtevant* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by William Fell Johnson, life tenant, and certain remaindermen, appellants, from a judgment on inquisition made absolute in favor of the appellants for the sum of $16,103, interest and costs, for the right to condemn certain property in Baltimore County. As provided by the inquisition, among other things was the perpetual right-of-way for an electric light and power line over the property of the appellants to be placed on three transmission towers. Each of the three towers will occupy a maximum space of 29 feet by 29 feet and have a maximum height of 117 feet and carry a 110,000-volt electric light and power line. The Consolidated Gas, Electric Light & Power Company of Baltimore, the appellee, is given the right to trim and cut all trees on the said right-of-way and any trees adjacent to and within 75 feet of said right-of-way to prevent interference with the electric light and power wires. The appellants are given the right to use that part of the right-of-way which is not occupied by the transmission line towers.

Appellants contend, contrary to the ruling of the trial court in refusing certain prayers of the appellants, (1) that under the provisions of 1939 Code, Article 23, Section 296, the appellee's power of condemnation is subject to the condition that its poles and wires "shall not be so constructed as to * * * interfere with the convenience of any land owner more than is unavoidable" and that appellants are thereby entitled to show by way of defense, "(a) That serious and irreparable damage will be caused by the proposed overhead transmission line through high-class residential property such as the Green Spring Valley; (b) That such damage will be

wholly avoided if the line is placed underground; and (c) That it is practicable and not unduly expensive to place the line underground."

(2) The second contention of the appellants is that the damage from the entire transmission line is not limited to consideration of those portions placed on their property, since the entire transmission line is a single unit, and that they are entitled to damages from the construction of the proposed transmission line across the property of others because their property would be damaged by the sight of the transmission line on the property of others.

It is stipulated in the record that the appellee has the powers conferred by Article 23, Section 335, of the Code of 1939 of the Public General Laws of Maryland. Appellee admits that its power of condemnation is derived under Article 23, Section 335, *supra*, Acts of 1886, Chapter 161. This section provides in part as follows:

"Any of the corporations formed under class thirteen, section 28 of this article, as codified by the Code of 1904, shall have the power which is conferred upon telegraph companies incorporated under this article by section 296, and may construct and lay any part of its line or lines underground on any route for which it is authorized to construct such lines in whole or in part, above ground, and such corporation may acquire by condemnation any property or right whatsoever necessary for its purposes in its discretion, either in fee simple or the use thereof in fee simple, or for a less estate * * *."

The appellants contend and the appellee denies that the power of condemnation of the appellee given under Section 335 is narrowed down to the interpretation of Article 23, Section 296, 1939 Code, Acts of 1868, Chapter 471, Section 128. That section provides in part as follows:

"It may construct a line or lines of telegraph through this State, or from or to any point or points within this State, or upon the boundaries thereof, and along and upon any postal roads and postal routes, roads, streets

and highways, or cross any of the bridges or waters within the limits of this State, by the erection of the necessary fixtures, including posts, piers or abutments for sustaining the cords or wires of such lines, without their being deemed a public nuisance, or subject to be abated by any private party; provided, the same shall not be so constructed as to incommode injuriously the public use of said postal roads or postal routes, roads, highways and bridges or injuriously interrupt the navigation of said waters, or interfere with the convenience of any land owner more than is unavoidable; * * *."

At the time of the passage of the Acts of 1868, Article 23, Section 296, *supra,* underground electric lines were not in existence. By Article 23, Section 335, *supra,* corporations, such as the appellee, were given power to construct their lines underground, to "acquire by condemnation any property or right whatsoever necessary for its purposes in its discretion." In the opinion of this Court the grant in the statute of "the power which is conferred upon telegraph companies incorporated under this article by section 296" was the grant to corporations such as the appellee of the franchise or rights to construct lines along roads, streets, and highways, across any of the bridges or waters within the State without the said corporation being deemed a public nuisance; provided "the same shall not be so constructed as to incommode injuriously the public use of said postal roads or postal routes, roads, highways and bridges or injuriously interrupt the navigation of said waters, or interfere with the convenience of any land owner more than is unavoidable; * * *." In other words, the limitations just above quoted are limitations on the franchise rights and not limitations on the condemnation powers. We here use the word franchise to describe a grant by a state to some person, natural or corporate, of some privilege or power, not common to the people generally, in respect to property or rights subject to the control of the state or of some agency of the state. *Huebschmann v. Grand Co.,* 166 Md. 615, 622, 172 A. 227.

That these corporations are liable for proper compensation for these franchise rights has been many times stated by this Court. *Postal Telegraph Cable Co. v. State Roads Commission,* 127 Md. 243, 246, 96 A. 439; *Chesapeake & Potomac Tel. Co. v. State Roads Commission,* 134 Md. 1, 4, 106 A. 257; *Baltimore v. Chesapeake & Potomac Telephone Co.,* 142 Md. 79, 82, 120 A. 229; *American Telegraph & Telephone Co. v. State Roads Commission,* 134 Md. 11, 14, 106 A. 260; *Chesapeake & Potomac Telephone Co. of Baltimore City v. State Roads Commission,* 132 Md. 194, 197, 103 A. 447.

That the limitation that the use must not injuriously interrupt the navigation of waters or interfere with the convenience of any land owner more than is unavoidable, is a limitation on franchise rights rather than on the power of condemnation, is borne out by the following quotation from the case of *State; for Use of Hoffman v. Potomac Edison Co.,* 166 Md. 138, at page 146, 170 A. 568, at page 571, where this Court said: " 'The statute authorizing corporations to construct their lines along and upon the highways and across the bridges and waters of the state, by the erection of the necessary fixtures, provides that they "shall not be so constructed as to incommode injuriously the public use of said postal roads or postal routes, roads, highways and bridges, or injuriously interrupt the navigation of said waters, or interfere with the convenience of any landowner more than is unavoidable." Code, 1904, Art. 23, Sec. 324; Annotated Code, 1912, Art 23, Sec. 359'." Now Article 23, Section 296, 1939 Code, *supra.* " '* * * * The appellant's brief contains a suggestion that the prohibition of the act was merely that the public use of the roads shall not be injuriously incommoded more than is unavoidable. We do not so construe the meaning of the statute. The term "unavoidable" is plainly intended to qualify only the restriction upon interference with the convenience of landowners and has no relation to the provision against incommoding the public use, to which the adverb "injuriously" is applied'." *Phelps v.*

*Board of Com'rs of Howard County,* 117 Md. 175, 180, 82 A. 1058; *Earp v. Phelps,* 120 Md. 282, 287, 87 A. 806.

The Act of 1886, passed after the Act of 1868, in addition to other things, gave to corporations in the classification of appellee condemnation powers and added the requirements of "necessity."

In the case before this Court, as the property in question is private property, the only limitation therefore upon the appellee's right to condemn is whether the property right sought to be condemned is "necessary for its purpose in its discretion."

There is no contention by the appellants that an electric line at the location here contemplated is not necessary. They contend, however, that such line should be placed underground and not overhead.

The question of necessity is one for the court to decide. Ordinarily the question of public interest is legislative rather than judicial. It was said in *Murphy v. State Roads Commission,* 159 Md. 7, at page 15, 149 A. 566, at page 570, quoting from *Nichols, Eminent Domain,* Secs. 333, 334: " 'The legislature may, and usually does, delegate the power of selecting the land to be condemned to the public agent that is to do the work. In such case it makes little if any difference whether the grant of authority is in terms limited to such land as is "necessary" for the purpose in view, for a general grant of authority carries the same limitation by implication and in either case the necessity is primarily for the party taking, and not for the courts to decide, and the decision of such party is final as long as it acts reasonably and in good faith. If the land is of some use to it in carrying out its public object, the degree of necessity is its own affair. Whether there is any necessity whatever to justify the taking is, however, a judicial question'." *Matthaei v. Housing Authority,* 177 Md. 506, 514, 9 A. 2d 835; *Riden v. Philadelphia, B. & W. R. Co.,* 182 Md. 336, 345, 35 A. 2d 99.

It was further said in the case of *Webster v. Susquehanna Pole Line Co.,* 112 Md. 416, at page 433, 76 A.

254, at page 260, 21 Ann. Cas. 357, "But it is further contended by the appellant that there is no provision of law determining the *necessity* of the taking, either by the jury of inquisition or by a Court of competent jurisdiction, and the taking therefore is without due process of law, both under the Constitution of the state, and the fourteenth amendment to the Constitution of the United States. But in *New Central Coal Co. v. George's Creek Coal Co.*, 37 Md. 565, speaking of the necessity of taking, the Court said: 'It is proper that these questions be referred exclusively to the court specially clothed with jurisdiction and power to pass on the propriety of the inquisition of condemnation. * * *'."

The necessity for taking does not have to be absolute but only reasonable. The electric line here proposed is to connect with another line which has been constructed known as the "ring" line. The construction of this ring line was contested in the case of *Realty Improvement Co. v. Consolidated Gas, Electric Light & Power Co.*, 156 Md. 581, 144 A. 710. It was said in that case, at pages 585 and 586 of 156 Md., at page 712 of 144 A.: "And the explanation of purposes given in the testimony is to the effect that this line is to serve sections of Baltimore County with light and power, which will clearly be of utility and convenience to the public, and which cannot otherwise be so economically provided; and such an advantage to the public is sufficient for a finding of the requisite public necessity for the exercise of the power of eminent domain. 'It is enough, if it clearly appears, that the application of such private property to the proposed new use will be attended by a material public benefit which would not otherwise be so immediately and effectually produced.' *Bellona Co.'s Case*, 3 Bland. 442, 451; *New Central [Coal] Co. v. George's Creek Co.*, 37 Md. [537], 557, 560; *Webster v. Susquehanna Pole Line Co.*, 112 Md. 416, 76 A. 254, 21 Ann. Cas. 357."

The appellee here, under the power of eminent domain, has no right to take private property arbitrarily or

utterly at variance with its delegated power and so as to inflict unnecessary damage upon the property owner. In *New Central Coal Co. v. George's Creek Coal & Iron Co., supra,* it was emphasized, in referring to the power of eminent domain: "To justify the exercise of this extreme power, * * * the party claiming the right to the exercise of the power should be required to show at least a reasonable degree of necessity for its exercise. Any rule less strict than this, with the large and almost indiscriminate delegation of the right to corporations, would likely lead to oppression, and the sacrific of private right to corporate power." *Riden v. Philadelphia, B. & W. R. R. Co., supra,* 182 Md. 345, 346, 35 A. 2d 99; *Huffman v. State Roads Commission,* 152 Md. 566, 583, 137 A. 358.

The court in passing upon whether the condemnation sought is reasonably necessary is limited in its inquiry as to whether the discretion exercised by the party condemning is honestly exercised. In the case of *Murphy v. State Roads Commission, supra,* where condemnation of a road was sought by the State Roads Commission, this Court said, at page 18 of 159 Md., at page 571 of 149 A.: "The engineers for the commission testified that the sour apple tree route was safer, more economical, and more convenient. While they were contradicted by appellant's witnesses, it is not our purpose to weigh or resolve that conflict, since our reference to the evidence has not been to decide whether the commission exercised the discretion reposed in it wisely, but whether it exercised it honestly. And as in our opinion the evidence clearly shows that the commission did not select the proposed route until it had examined and carefully considered such relevant facts as should have affected its conclusion, we find no abuse of the discretion vested in it, and it will not be reviewed."

Unless the discretion of the condemning agency as to reasonable necessity is wrongfully, arbitrarily, or oppressively exercised, that discretion cannot be controlled or reviewed by the Court, *State Roads Commission v.*

*Redmiles,* 176 Md. 677, 681, 6 A. 2d 551. The courts are not empowered to oppose their judgment to that of the condemning authority. *Matthaei v. Housing Authority, supra,* 177 Md. at page 514, 9 A. 2d 835.

The trial court, by the granting of the first prayer, passed upon the necessity of the condemnation. By that prayer the jury was instructed as follows: "The Court instructs the Jury that its verdict shall be for the Plaintiff on the right to condemn the right of way easement described in the Petition in this case, and that the only question before the Jury is the amount of damages to be awarded to the Defendants for the taking therefor." *Johnson v. City of Baltimore,* 158 Md. 93, 97, 106, 148 A. 209, 66 A. L. R. 1488. Therefore one of the questions before this Court is whether the trial judge was correct in holding that the appellee honestly exercised its discretion in determining the reasonable necessity of constructing the electric line here sought to be constructed over the land of the appellants as an overhead line rather than underground.

The appellants claim that this proposed line will despoil a large part of the Green Spring Valley and adjacent areas of Baltimore County. Further that such an overhead line destroys the beauty of the area and is dangerous and that the development of property and the value thereof would be greatly curtailed by the presence of a steel power line on a wide right-of-way and that such damage will be wholly avoided if the line is placed underground.

The testimony of the appellee contained the following statements: The line traversed open countryside. It is an ordinary 110 kv tower line practically identical with its fifty-mile "ring" line passed on by this Court in the cases of *Realty Improvement Co. v. Consolidated Gas, Elec. Light & Power Co. of Baltimore,* 1929, *supra; Schnepfe v. Consolidated Gas, Elec. Light & Power Co. of Baltimore,* 1933, 164 Md. 630, 165 A. 889. It has 150 miles of this line in operation. Appellee never knew of anyone being injured by those lines. The public

service in 83 square miles of territory requires more power in that area. The only practical transmission line is the overhead one over the route proposed. The location, operation, continuity of supply, economy, and overall system planning are all best promoted by the present plan. As a result of a complaint made, the chief engineer of the Public Service Commission personally inspected the proposed route and examined other routes. He reported that the proposed route is by far the best selection. Consideration was given to the substitution of an underground line in place of the proposed overhead system and in his report he said: "It is difficult to justify the expense of such a substitution." According to his estimate the cost of the underground route would be approximately $98,000 per mile, which is approximately the total amount proposed to be spent for the 5.8 miles of overhead line. He recommended that the construction of the line as proposed be approved.

Mr. William McLean, the general superintendent of electrical distribution for appellee, testified that the overhead line is much cheaper than the underground one. The overhead line is a much simpler problem than the underground one in assuring continuity of service. If a 110,000-volt line is placed underground it might take a matter of months to repair it while the overhead line could ordinarily be repaired within a very short time. The manufacturer does not keep underground cables in stock. These have to be built.

Of course, any large outlay in the cost of constructing this line will be reflected in higher electric rates to the public as consumers.

Among other witnesses the appellants offered testimony of Dr. John D. Whitehead, Emeritus Professor of Electrical Engineering at Johns Hopkins University and consultant of many electrical companies, "that as voltage of a line goes up greater dangers are involved unless peculiar precautions are taken." The appellants also made a proffer to prove by Dr. Whitehead that practicable and thoroughly tested methods are available

by which power can be transmitted at high voltage in underground cables and that the Pennsylvania Railroad maintains an underground cable line three miles long in Baltimore City at a voltage of more than 110,000 volts. They also offered by this proffer, to prove by Dr. Whitehead, that the total cost of the proposed line constructed overhead would be $200,000 including the estimated costs of rights of way and that the cost of the same line underground would be $229,000 assuming that free rights of way are available. This proffer of Dr. Whitehead's testimony was refused by the court.

As to the refusal of the trial judge to accept that proffer, that testimony was to the effect that this power line could have been transmitted underground, and that some lines of this voltage are underground. This was wholly immaterial. The other part of Dr. Whitehead's testimony which was refused was to the effect that the underground line would not cost much more than the one overhead. As economy is one of the elements to be considered by the appellee in its discretion in determining the type of line to be constructed, we think the appellants were not injured by the refusal of this proffer, the necessity being a question for the court and not for the jury. As to the refusal to allow this testimony of Dr. Whitehead to be given the jury, in the case of *City of Baltimore v. Park Corporation,* 126 Md. 358, 95 A. 33, the City of Baltimore proposed to install a system of drains and instituted condemnation proceedings for the purpose of connecting its drains with a drain of a defendant corporation. In that case a witness, after testifying as to the proper compensation to be paid to the defendant by the City, was asked as to other methods available to the City for the disposal of sewage and the cost of such methods. In holding this testimony inadmissible, this Court said, at page 366 of 126 Md., at page 36 of 95 A., "This evidence was clearly inadmissible. The issue before the court, was not the cost of doing something else, but the proper compensation for the connection which the city was con-

demning. * * * The cost of doing an entirely different thing could shed no light upon the injury done or the just compensation to be paid."

As in the case of *Murphy v. State Roads Commission, supra,* reference being here made to the quotation *supra* from page 18 of 159 Md., page 571 of 149 A., testimony was here given that the proposed overhead route was safe, more economical, the best selection and that the expense and delay in making repairs would not justify the underground route. While this testimony was contradicted in some details by appellant's witnesses, it is not the province of this Court to weigh or resolve that conflict. Our reference to the evidence has only been to decide whether the appellee exercised its discretion honestly and not to decide whether that discretion was exercised wisely. The evidence here shows that the appellee is not selecting the proposed route until it has examined and carefully considered the alternate underground route proposed by the appellants. We find no abuse of the discretion vested in the appellee by the Legislature and this discretion will not be reviewed by this Court. The trial judge was therefore correct in instructing the jury that its verdict should be for the appellee on the right to condemn the right-of-way easement.

(2) As to the second contention of the appellants, raised here by the refusal of the trial judge to admit evidence on the point, that they should be allowed damages for the transmission line constructed on seven steel towers on the property of others across the Falls Road which borders appellants' property, as far as we are able to determine no such contention has ever been made before in any of the cases in this Court. It appears to be agreed by all parties to this suit that the landowners are entitled to consequential damages to the remainder of their land caused by the taking of the easement over a part of their land.

The Maryland Constitution, Article 3, Section 40, provides: "The General Assembly shall enact no Law au-

thorizing private property to be taken for public use, without just compensation as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation." It is further provided by the Constitution of Maryland, Article 3, Section 40-A, in part and as follows: "The General Assembly shall enact no law authorizing private property to be taken for public use without just compensation, to be agreed upon between the parties or awarded by a jury, being first paid or tendered to the party entitled to such compensation, * * *."

The statutes in this State providing for the measure of damages in condemnation cases are Code, 1939, Article 33A, Section 7, Acts of 1914, Chapter 463, Section 8, and Article 33A, Section 9, Acts of 1914, Chapter 463, Section 9. These provide in part as follows: Section 7: "As soon as said jury is selected * * * they shall be sworn to justly and impartially value the damages which the defendant owner or owners will sustain *by the taking, use and occupation of the property described in the petition, by the petitioner,* for the purposes therein set out, and after being so selected and sworn, the Court shall direct the sheriff to take the jury upon the grounds and premises sought to be condemned, to view the same in the usual way in condemnation cases." Section 9: "After said view, and the jury has returned to said Court, the trial of the issues of law and fact in the case, *relative to the right to condemn said land, and the damages which will be occasioned to the defendant owner or owners thereof by the taking, use and occupation thereof by the petitioner,* and the amount of just compensation therefor to each defendant, * * *." (Italics supplied here.)

It is pertinent to note that under the Constitution and statutes of this State the damage in cases of eminent domain is limited to the taking, use and occupation of the defandant property, and not to "damage and taking." It is also pertinent to note that the statute, Article 33A, Sections 7 and 9, by which the jury is bound in award-

ing damages, confines the damages by Section 7 to "the taking, use and occupation of the property described in the petition," and by Section 9, to "the damages which will be occasioned to the defendant owner or owners thereof by the taking, use and occupation thereof by the petitioner."

Although, as above stated, this second contention of the appellants has apparently never before been made in any of the cases in this Court, it appears that this contention is answered in a number of cases where the Court has definitely set out the method which the jury must follow in determining the measure of damages in condemnation cases. As above stated, in the case of *Realty Improvement Co. v. Consolidated Gas, Elec. Light & Power Co. of Baltimore,* 1929, 156 Md. 581, 144 A. 710, *supra,* the appellee here sought to condemn an easement for the steel towers and electric wires known as the "ring" line, across certain property, to which the present line is to be attached. That line, like the one here, was a single unit. As to the measure of damages, this Court said, at pages 588 and 589 of 156 Md., at page 713 of 144 A: "Where a part of a tract or parcel of land is taken by eminent domain, the owner is entitled to receive as an irreducible compensation the actual value of what was taken, whether it be the fee or an easement, and this compensation may be accurately and practically measured in cases in which the property taken is not readily and fairly susceptible of separate independent valuation, by the difference between the fair market value of the entire tract or parcel without the taking and its fair market value after such taking, excluding the effect of the future corporate use of the parcel taken. In addition to this value, which the owner is entitled to be awarded by the jury in any event, the jury is bound to allow the consequential damages, if any, to the remainder of the tract or parcel after the taking by reason of or in consequence of the future corporate use and enjoyment of the part taken, but such consequential damages are to be diminished to the extent of the par-

ticular benefits, if any, to the remainder of the tract or parcel arising from the future corporate use of the part taken as contradistinguished from the general benefits in which the remaining property of the owner would share with the other contiguous land in the neighborhood of the public utility and the owner."

In the later case of *Pumphrey v. State Roads Commission,* 1938, 175 Md. 498, 2 A. 2d 668, the appellee sought to condemn 1.9 acres of land of the appellant. In speaking of the measure of loss to the appellant, this Court said, at pages 505 and 506 of 175 Md., at page 671 of 2 A. 2d: "The measure of that loss is the value of the land taken, and since the land taken is part of a larger tract, the diminution in value of the larger tract, if any there be, caused by the taking of the particular segment thereof. Ordinarily that measure is ascertained by comparing the fair market value of the whole lot before the taking with the fair market value thereof after the taking, excluding from consideration any enhancement in value resulting from the utilization of the land taken for the purpose for which it was taken. In determining the fair market value of the land, consideration may be given to any utility to which it is adapted and for which it is immediately available. Market value is defined as the price which an owner willing but not obliged to sell would accept for the property and which a buyer willing but not obliged to buy would pay therefor."

Therefore this second contention of the appellant seems to be answered by these direct and broad statements by this Court as to the measure of damages in its interpretation of the statute, Code, Article 33A, and in none of those statements has any intimation been made that the owner of the property condemned is entitled to damages by reason of the taking, use, and occupation of property owned by other persons.

In spite of these direct statements by this Court, appellants contend that out-of-State authorities hold that since the entire transmission line is a single unit, "that

the use made of adjoining land is to be considered 'so far as it is due to proximity secured by means of taking a part of the petitioner's land, and would not have resulted but for such taking'." This second contention of the appellants has been ably argued by both the appellants and the appellee and we have been furnished elaborate briefs and many citations by both sides. We cannot comment on all the cases cited. To do so would lead to almost endless discussion.

The case of *Campbell v. United States of America,* 266 U. S. 368, 45 S. Ct. 115, 69 L. Ed. 328, has been cited by both the appellants and the appellee. In it are noted most of the important cases referred to in the briefs. That case involved the fixing of compensation for the taking of property by right of eminent domain. The United States took 1.81 acres of the land of John V. Campbell to be a part of a site for a plant for the production of nitrates. The site taken was a garden lying at the foot of a hill on which Campbell's residence was situated. The entire tract, including the land taken from Campbell, consisted of 1,300 acres. The United States constructed on this site roads, buildings, railroads, a sewage system, and such other things as are usually necessary to a large industrial plant. The United States District Court found that the value of the land taken was $750, and that by the taking, the remainder of Campbell's property was damaged to the extent of $2,250. "It also found that, by reason of the uses to be made of lands acquired from others for the same project, plaintiff's lands not taken were damaged $5000.00." The court allowed the items of $750 and $2,250 and disallowed the $5,000 item and gave judgment for $3,000 and interest. From that judgment Campell appealed.

The Fifth Amendment to the Constitution of the United States provides in part, "nor shall private property be taken for public use, without just compensation." Damages are thereby limited to "the taking" as in the Constitution of Maryland, *supra,* and Article 33A of the Code of Maryland, *supra.* The Supreme Court of

the United States in that case said that Campbell was entitled to have the just compensation safeguarded by the Fifth Amendment of the Constitution; that is, the value of the land taken and the damages inflicted by the taking. The proposed use of the land taken from others did not constitute a taking of Campbell's property. He had no right to prevent the taking and use of land of others. The condemnation did not deprive him of any right in respect to the land of others. The Court said further, at pages 371 and 372 of 266 U. S., at page 116 of 45 S. Ct., in affirming the judgment of $3,000:

"And, if the land taken from plaintiff had belonged to another, or if it had not been deemed part and parcel of his estate, he would not have been entitled to anything on account of the diminution in value of his estate. It is only because of the taking of a part of his land that he became entitled to any damages resulting to the rest. In the absence of a taking, the provision of the Fifth Amendment giving just compensation does not apply; and there is no statute applicable in this case that enlarges the constitutional right. If the former private owners had devoted their lands to the identical uses for which they were acquired by the United States or to which they probably will be put, as found by the court, they would not have become liable for the resulting diminution in value of plaintiff's property. The liability of the United States is not greater than would be that of the private users. Plaintiff cites and relies upon *Blesch v. Chicago & N. W. Ry. Co.,* 43 Wis. 183; *Chicago, K. & N. R. Co. v. Van Cleave,* 52 Kan. 665, 33 P. 472, and *Haggard v. Independent School Dist.,* 113 Iowa 486, 85 N. W. 777, to support his contention that he is entitled to have the damages found to have resulted to the remainder of his estate by the uses made and to be made of the lands acquired from others. In each of these cases, it was impossible separately to ascertain the damages caused to the remainder of the owner's tract by the taking and proposed use of a part of it. In this case,

such damages were separately found, and plaintiff does not complain in respect of the amount of that element. We think that plaintiff's contention is not sustained. The rule supported by better reason and the weight of authority is that the just compensation assured by the Fifth Amendment to an owner, a part of whose land is taken for public use, does not include the diminution in value of the remainder caused by the acquisition and use of adjoining lands of others for the same undertaking. See *Walker v. Old Colony & N. Ry. Co.,* 103 Mass. 10, 15, 4 Am. Rep. 509; *Lincoln v. Com.,* 164 Mass. 368, 377, 41 N. E. 489; *Adams v. Chicago, B. & N. R. Co.,* 39 Minn. 286, 39 N. W. 629, 1 L. R. A. 493, 12 Am St. Rep. 644; *Keller v. Miller,* 63 Colo. 304, 307, 165 P. 774; *Horton v. Colwyn Bay & C. Urban [Dist.] Council* [1908], 1 K. B. 327, 77 L. J. K. B. N. S. 215, 72 J. P. 57, 98 L. T. N. S. 547, 24 Times L. R. 220, 6 L. G. R. 211, 52 Sol. Jo. 158—C. A."

In the instant case, as in the case of *Campbell v. United States of America, supra,* the damages resulting to the remainder of the land not taken were separable from those caused by the use to be made of the land acquired from others, because appellants own witnesses in their testimony were able to separate such alleged damages. We must therefore conclude that the trial judge was correct in refusing the proffered testimony as to the damage caused to the appellants' land by the use of adjoining land of others on which the proposed overhead electric line is to be constructed. As we find no error the judgment will be affirmed.

*Judgment affirmed, with costs.*